IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

PAMELA J. DANIELS, *et al.*,

     Plaintiffs,

  vs.                         Case No. 2:15-cv-408
                                     Magistrate Judge King

PIKE COUNTY COMMISSIONERS,
*et al.*,

     Defendants.

## OPINION AND ORDER

This is an employment action in which plaintiffs assert claims of hostile work environment, sex discrimination, and retaliation. This matter is now before the Court, with the consent of the parties pursuant to 28 U.S.C. § 636(c), on *Defendants'* [sic][1] *Motion for Summary Judgment*, ECF No. 25 ("*Defendant's Motion*"); *Plaintiffs' Response to Defendants'* [sic] *Motion for Summary Judgment*, ECF No. 31 ("*Plaintiffs' Response*"); and *Defendants'* [sic] *Reply to Plaintiffs' Response to Defendants'* [sic] *Motion for Summary Judgment*, ECF No. 35 ("*Defendant's Reply*").  For the reasons that follow, *Defendant's Motion* is **GRANTED**.

## I.   Background

Defendant Robert Junk has served as Pike County Prosecutor since 1996.  *Deposition of Charles R. Junk, Jr.*, ECF No. 34-1, p. 7 ("*Junk Deposition*").[2]

---

[1] Defendant Junk is the only defendant remaining in the action. He has been sued in his official and individual capacities.
[2] Defendant Junk apparently uses his middle name, Robert, as a first name rather than his given first name, Charles.  *Id.; Answer*, ECF No. 17.

Plaintiff Daniels began working as a secretary in the
Prosecutor's office in November 1997, taking "care of the county court
cases." *Affidavit of Plaintiff Pamela J. Daniels*, ¶ 3, attached as
Exhibit A to *Plaintiffs' Response* ("*Daniels Affidavit*"); *Deposition of
Pamela J. Daniels*, pp. 10-11 ("*Daniels Deposition*").  Later, she
became victim/witness coordinator, sending notices to each witness and
victim in every felony case, assisting victims with filings for
compensation, communicating with victims about their cases, answering
telephones, and performing general office duties.  *Daniels Affidavit*,
¶ 3; *Daniels Deposition*, pp. 11-12.  In both capacities, plaintiff
Daniels worked under the direct supervision of defendant Junk.
*Daniels Affidavit*, ¶ 4.

Plaintiff Barron was hired as a secretary in the Prosecutor's
office in January 2009 and worked under the supervision of defendant
Junk.  *Affidavit of Rachel E. Barron*, ¶¶ 3-4, attached as Exhibit B to
*Plaintiffs' Response* ("*Barron Affidavit*").  Plaintiff Barron's duties
included preparing files and praecipes for county court and juvenile
court proceedings, sending notices to victims, communicating with
victims, depositing restitution checks, preparing victims' restitution
checks, assisting with grand jury matters, and assisting plaintiff
Daniels with her duties. *Deposition of Rachel E. Barron*, ECF No. 26-1,
pp. 10-11 ("*Barron Deposition*").  Generally, plaintiff Barron's duties
kept her in the office.  *Id*. at 11.[3]

---

[3] At various times relevant to this action, the Prosecutor's office also
employed the following individuals:  Angela Farmer (office manager), Dave
Dickerson (diversion officer), Aaron Gullett (diversion officer who assumed

In October 2013, the atmosphere in the Prosecutor's office changed and plaintiffs complain that defendant Junk began treating female employees differently than male employees. *Daniels Affidavit*, ¶ 5; *Barron Affidavit*, ¶ 5. Defendant Junk announced that employees would no longer be permitted to work four ten-hour days, but instead would be required to work between the hours of 8:30 a.m. and 4:30 p.m.; employees would also be required to punch a time clock. *Daniels Affidavit*, ¶ 7; Exhibit A1 (copy of office policy), attached thereto; *Barron Affidavit*, ¶ 7; *Daniels Deposition*, pp. 54-56, 68, 73; *Barron Deposition*, pp. 19-21. However, plaintiffs allege, defendant Junk did not enforce this policy against the male employees.

Defendant Junk also established an office dress code, effective November 2013, that prohibited jeans except on Fridays. *Daniels Affidavit*, ¶¶ 6, 11; *Daniels Deposition*, pp. 22-24; *Barron Deposition*, p. 22; *Junk Deposition*, pp. 67-68. Prior to that time, employees wore a variety of clothing, including jeans and flip-flops. *Barron Deposition*, pp. 22-23; *Junk Deposition*, p. 67; *Deposition of Angela Farmer*, ECF No. 29, p. 25 ("*Farmer Deposition*"). However, defendant Junk did not enforce the no-jeans code as to some of the male employees in the Prosecutor's office, including diversion officer

---

some of plaintiff Barron's duties after her departure), Rob Smith (investigator), Charlie Reader (diversion officer and, later, investigator), Jason Savage (diversion officer), and Hank Steiger (diversion officer). *Id.* at 9-10, 12, 71; *Barron Deposition*, pp. 14-15; *Affidavit of Claudie Aaron Gullett*, ¶ 4, attached as Exhibit C to *Plaintiffs' Response* ("*Gullett Affidavit*"). Andrew Roberts also worked in the Prosecutor's office as a legal intern in the summer and winter of 2013. *Junk Deposition*, p. 12; *Affidavit of Andrew Roberts*, ¶¶ 2-4, attached as Exhibit D to *Plaintiffs' Response*.

Jason Savage and diversion officer (and, later, investigator) Charlie Reader. *Barron Deposition*, p. 24; *Junk Deposition*, p. 67. When plaintiff Daniels requested additional time to buy clothing in order to comply with the new dress code, defendant Junk granted that request. *Daniels Deposition*, p. 24; *Roberts Affidavit*, ¶ 12; *Farmer Deposition*, pp. 25-26. A few days later, however, defendant Junk asked plaintiff Daniels, "And didn't I say we were going to change the dress code around here? Aren't you wearing jeans?" *Daniels Deposition*, pp. 25-26. When plaintiff Daniels reminded him of his grant of additional time, defendant Junk responded, "Well, if you say so" and "[s]tomped off." *Id*.

Plaintiffs also complain that defendant Junk became generally hostile toward them and engaged in harassing activities. On one occasion, defendant Junk entered the front office (where the female employees worked) and loudly popped some packing materials, which sounded like a gunshot and startled plaintiffs. *Daniels Deposition*, p. 60. On another occasion, defendant Junk said something to the effect of, "Well, there's a song about everything, and one of those songs is 'Get the Fuck Out' by Cee Lo Green," which plaintiff Daniels understood to be directed at the female employees. *Id*. at 63-64. On another occasion, defendant Junk went to plaintiff Daniels' desk and laughed at her, telling her that she "looked like you just lost your best friend;" it seemed to her that he enjoyed upsetting her. *Id*. at 72. On one or two other occasions, defendant Junk said to members of the public who were in the office, "[T]hese girls have work they need

to be doing. I'm just making sure they're doing what they're supposed to do." *Daniels Deposition*, p. 63; *Barron Deposition*, pp. 33-34; *Junk Deposition*, pp. 50-51. Defendant Junk routinely said in front of female employees, "Everybody working. Nobody whining. That's the way we like it." *Daniels Deposition*, pp. 61-62; *Barron Deposition*, p. 38. According to a male employee, defendant Junk "stated on a few occasions that 'he didn't need them [plaintiffs] as friends because he had plenty,'" *Affidavit of Andrew Roberts*, ¶ 13, attached as Exhibit D to *Plaintiffs' Response* ("*Roberts Affidavit*")*,* and, "instead of addressing them directly, he would speak to others about them as if they were not present." *Id.* at ¶ 14. Defendant Junk did not behave in a similar way toward male employees. *Id.* at ¶ 15. Defendant Junk would also talk to plaintiffs "about how we're at-will employees, and that we can be terminated at any point in time, which we understood." *Barron Deposition*, p. 41.

Plaintiffs also complain that defendant Junk, knowing that he did not enforce the time clock policy against the male employees, would ask in front of the female employees if everybody had punched the time clock. *Daniels Deposition*, p. 62; *Barron Deposition*, p. 39; *Daniels Affidavit*, ¶ 8; *Barron Affidavit*, ¶ 8; *Roberts Affidavit*, ¶ 6. Plaintiff Barron viewed this behavior as attempting to get a rise out of the women: "[Defendant Junk] gets off on getting a rise out of you. He gets off on seeing you upset." *Barron Deposition*, p. 39. *See also Roberts Affidavit*, ¶ 7 ("I observed that on one morning, Mr. Junk

antagonized the female employees about this new policy by asking snidely, 'Did everyone get clocked in?'").

Early on November 15, 2013, defendant Junk accessed each of the female employees' work computers, and pulled up their internet search histories and left those histories on their screens when the employees arrived for work that day. *Daniels Affidavit*, ¶ 9; *Barron Affidavit*, ¶ 9; *Junk Deposition*, pp. 37-39. Defendant Junk did not display such histories on the male employees' screens. *Id.*; *Daniels Deposition*, p. 20. When plaintiffs asked about the displayed histories, defendant Junk became angry and screamed, "Don't think you can't be replaced." *Daniels Deposition*, pp. 18, 38-39; *Daniels Affidavit*, ¶ 10; *Barron Affidavit*, ¶ 10. Plaintiff Barron, upset over the incident, left the office crying. *Daniels Deposition*, p. 38.

On December 3, 2013, plaintiff Barron submitted her resignation. *Barron Deposition*, pp. 11-12, 15; *Farmer Deposition*, pp. 20-21, 50.[4] Defendant Junk hired as her replacement a male diversion officer, Aaron Gullett. *Barron Affidavit*, ¶ 14; *Daniels Affidavit*, ¶ 20; *Farmer Deposition*, pp. 81-82.

Sometime after plaintiff Barron's resignation, defendant Junk brought a gun, an AR-15, into the office ("the gun incident"). *Daniels Deposition*, p. 30. According to plaintiff Daniels, defendant Junk stood in a doorway, approximately 20-25 feet from her, held the gun up in the air and said, "Hey Pam." *Id.* When she looked up from her computer, defendant Junk said, "Don't worry. I'm not that mad,"

---

[4] The record also refers to a resignation date of December 3, 2014, *see*, *e.g.*, *Barron Affidavit*, ¶ 13, but that date appears to be erroneous.

and laughed. *Daniels Deposition*, pp. 30-31, 34; *Daniels Affidavit*, ¶ 15; *Farmer Deposition*, p. 45.[5]

On January 15, 2014, plaintiff Daniels, as part of her duties, went to the Pike County courthouse for a hearing. *Daniels Affidavit*, ¶ 16; *Daniels Deposition*, p. 36. While in court, she complained to Dominique Hanna and Tara Tackett, Pike County employees who worked for different agencies, about the gun incident and "everything" with defendant Junk. *Daniels Deposition*, pp. 36-37, 51; *Daniels Affidavit*, ¶ 17. Defendant Junk, having learned of her complaints, terminated defendant Daniels' employment the next day. *Daniels Affidavit*, ¶ 19; *Junk Deposition*, pp. 62-64. Dave Dickerson replaced her. *Junk Deposition*, p. 21; *Farmer Deposition*, p. 81. Ms. Farmer also took over some of plaintiff Daniels's duties, including entering cases in the electronic system, sending out notices, and setting schedules. *Farmer Deposition*, pp. 81-82.

On January 30, 2015, plaintiffs filed this action. The *Amended Complaint*, ECF No. 11, asserts claims of hostile work environment, sex discrimination, and retaliation under Title VII, 42 U.S.C. § 2000e-5, and O.R.C. § 4112.02. Plaintiffs also assert claims of intentional infliction of emotional distress. *See id*.

**II. Standard**

The standard for summary judgment is well established. This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part:

---

[5] Defendant Junk describes this incident differently than does plaintiff Daniels, *see Junk Deposition*, pp. 41-44, 76-77, but the Court accepts her version of the event for purposes of these proceedings on summary judgment.

> The court shall grant summary judgment if the movant shows
> that there is no genuine dispute as to any material fact
> and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  In making this determination, the evidence
must be viewed in the light most favorable to the nonmoving party.
*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Summary judgment
will not lie if the dispute about a material fact is genuine, "that
is, if the evidence is such that a reasonable jury could return a
verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 243 (1986).  However, summary judgment is appropriate if
the opposing party fails to make a showing sufficient to establish the
existence of an element essential to that party's case and on which
that party will bear the burden of proof at trial.  *Celotex Corp. v.
Catrett,* 477 U.S. 317, 322 (1986).  The mere existence of a scintilla
of evidence in support of the opposing party's position will be
insufficient; there must be evidence on which the jury could
reasonably find for the opposing party.  *Anderson,* 477 U.S. at 251.

The party moving for summary judgment always bears the initial
responsibility of informing the district court of the basis for its
motion, and identifying those portions of the record which demonstrate
the absence of a genuine issue of material fact.  *Catrett,* 477 U.S. at
323.  Once the moving party has met its initial burden, the burden
then shifts to the nonmoving party who "must set forth specific facts
showing that there is a genuine issue for trial."  *Anderson,* 477 U.S.
at 250 (quoting former Fed. R. Civ. P. 56(e)); *Talley v. Bravo Pitino
Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir. 1995)("nonmoving party

must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial"). "Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert the previous allegations. It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'" *Glover v. Speedway Super Am. LLC,* 284 F. Supp.2d 858, 862 (S.D. Ohio 2003)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, the non-moving party must support the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Glover,* 284 F. Supp.2d at 862 (citing *InteRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989)). Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Id. See also* Fed. R. Civ. P. 56(c)(3).

## III. Discussion

### A. Evidence Regarding Angela Farmer

Defendant asks, first, that the Court disregard evidence of defendant Junk's alleged discriminatory treatment of Ms. Farmer, who

9

was the office manager for the Prosecutor's office but who is not a party to this action, characterizing such evidence as irrelevant. *Defendants' Reply*, p. 2.  Defendant's request in this regard is not well-taken.

This Court may consider, in connection with plaintiffs' claims of hostile work environment, defendant Junk's alleged behavior toward other women in the Prosecutor's office so long as plaintiffs were aware of such behavior.  *See*, *e.g.*, *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 718 (6th Cir. 2012) ("In short, a plaintiff does not need to be the target of, or a witness to harassment in order for us to consider that harassment in the totality of the circumstances; but [s]he does need to know about it."); *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999) ("An employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself.") (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986)).

**B.     Sexual Harassment – Hostile Work Environment (Counts I and IV)**

Plaintiffs allege that defendant Junk discriminated against them on the basis of their gender in violation of Title VII by subjecting them to a hostile work environment.  *Amended Complaint*, ¶¶ 31-37. Title VII makes it unlawful

> for an employer . . . to discriminate against any
> individual with respect to his compensation, terms,
> conditions, or privileges of employment, because of such
> individual's . . . sex . . . or to limit, segregate, or
> classify his employees . . . in any way which would deprive

10

> or tend to deprive any individual of employment
> opportunities or otherwise adversely affect his status as
> an employee, because of such individual's . . . sex. . . .

42 U.S.C. § 2000e-2(a)(1).  The standards applicable to claims of

sexual harassment under Title VII and O.R.C. Chap. 4112 are the same.

*See*, *e.g.*, *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263,

270 (6th Cir. 2009); *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828

(6th Cir. 2000) (stating, *inter alia*, that sex discrimination claims

need not be analyzed separately under state and federal law) (citing

*Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio

St.3d 607, 609–10 (1991)).  Accordingly, this Court will analyze these

claims together.

A hostile work environment exists where "the workplace is

permeated with discriminatory intimidation, ridicule, and insult that

is sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment."  *Smith

v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (quoting

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal

citations omitted).  In order to establish a claim of hostile work

environment, a plaintiff must show that "(1) she was a member of a

protected class; (2) she was subjected to unwelcome discriminatory

harassment; (3) the harassment complained of was based on sex; (4) the

charged sexual harassment created a hostile work environment; and (5)

[the defendant] is liable."  *Wierengo v. Akal Sec., Inc.*, No. 13–1890,

580 F. App'x 364, at *371 (6th Cir. Sept. 10, 2014) (quoting *Randolph

*v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)) (internal quotation marks omitted).

Assuming *arguendo* that plaintiffs can establish the first two elements, the parties disagree whether plaintiffs have established the third and fourth elements of their claims of hostile work environment.

### 1. Whether the harassment was based on sex

Plaintiffs complain of non-sexual harassment based on their gender. *See, e.g., Amended Complaint*, ¶¶ 12-29; *Plaintiffs' Response*, pp. 2-18. "[N]on-sexual conduct may be illegally sex-based where it evinces 'anti-female animus, and therefore could be found to have contributed significantly to the hostile environment.'" *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (quoting *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 905 (1st Cir. 1988)). "Thus, harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement." *Id.*

Plaintiffs have not shown that certain of the instances of harassment about which they complain are based on their gender. For example, plaintiffs allege that defendant Junk permitted at least some of the male employees to wear jeans, despite the new dress code. In actuality, plaintiff Daniels testified that she "honestly didn't pay attention to what the boys were wearing at that point" and could only "guess that they [the male employees] were allowed to wear jeans." *Daniels Deposition*, pp. 27-28. It is true that plaintiff Barron testified that the diversion officers, who are male, were allowed to

12

wear jeans. *Barron Deposition*, p. 24. However, defendant Junk explained that he permitted Jason Savage and Earl Sweptson,[6] diversion officers, to wear jeans because they engaged in physical exertion outside the office as part of their job duties. *Junk Deposition*, pp. 32, 67. Plaintiff Barron also complains that defendant Junk permitted Charlie Reader, initially a diversion officer and, at some point, an investigator, to wear jeans. *Barron Deposition*, pp. 14, 24. However, unlike plaintiff Barron, who was a secretary, Mr. Reader also apparently performed some of his duties outside the office. *Id*. at 20. *See also Junk Deposition*, p. 81 (testifying that Mr. Reader "was running the diversion program" for a period of time.) Moreover, defendant Junk permitted plaintiff Barron, who was pregnant at the time the dress code went into effect, to delay her compliance with the dress code. *Barron Deposition*, pp. 22-23. Considering the totality of this evidence, the Court cannot conclude that defendant Junk's enforcement of the dress code was "motivated by discriminatory animus against women" such that plaintiffs have satisfied the "based on sex" component of their claims in this regard. *See Williams*, 187 F.3d at 565.

Plaintiffs also complain that defendant Junk did not enforce, as against male employees, the new policy that required that employees work between the hours of 8:30 a.m. and 4:30 p.m. and punch a time clock. *See*, *e.g.*, *Daniels Affidavit*, ¶ 8; *Barron Affidavit*, ¶ 8;

---

[6] Mr. Sweptson apparently did not work as a diversion officer during the period of plaintiffs' employment; neither plaintiff refers to him in deposition testimony.

*Roberts Affidavit*, ¶ 6. The Court will disregard defendant Junk's insistence that the male diversion officers in fact punched the time clock on a consistent basis and that the male diversion officers (other than Jason Savage) worked from 8:30 a.m. to 4:30 p.m. *Junk Deposition*, pp. 27-29, 32-33. It is significant, however, that the plaintiffs (secretary and victim/witness coordinator) and Ms. Farmer (office manager) held different positions than the male employees (investigator/diversion officers/dispatcher/supervisor). Charlie Reader was not required to clock in or to work from 8:30 to 4:30 because he was an investigator who was on salary and who could "come[] and go as he pretty well pleased." *Id*. at 27-29, 31. Jason Savage, a diversion officer, was permitted to work from 7:00 a.m. to 3:00 p.m. because certain county sites opened at 8:00 a.m. and defendant Junk preferred that the diversion officer arrive early to prepare for offenders who arrived before 8:30 a.m. *Id*. at 32. Based on this record, plaintiffs have not persuaded this Court that defendant Junk's failure or refusal to enforce the time clock requirement and the 8:30 a.m. to 4:30 p.m. work schedule as against Messrs. Reader and Savage was "motivated by discriminatory animus against women[.]" *See Williams*, 187 F.3d at 565.

Plaintiff Daniels also alleges that, although her employment was terminated because she reported defendant Junk's misconduct, a male employee was not fired despite his own actual misconduct.

> He's never fired a male employee. Even after his diversion
> office [sic] slept with one of the girls that was on the
> diversion program, and that certainly didn't look good on
> the program, he still didn't fire Jason after - Rob was -

14

> he was fully aware of that. He didn't fire him, and he was
> a male. I get fired for telling the truth and because I'm a
> female.

*Daniels Deposition*, p. 71.[7] Ms. Farmer testified that there was "watercooler conversation about Mr. Savage having an inappropriate relationship with an offender," but she did not recall discussing that matter with defendant Junk. She assumed that "everybody knew" about the relationship because Mr. Savage and the offender (who are now married) "were out in public together." *Farmer Deposition*, pp. 63-64. Mr. Savage voluntarily left his employment with the Prosecutor's office. *Id*. at 63.

Defendant Junk testified that, although he had heard rumors of Mr. Savage's relationship with an offender, he had no actual evidence of an inappropriate relationship and that, lacking such evidence, he would not fire Mr. Savage. *Junk Deposition*, p. 19-21. Defendant Junk asked Mr. Savage about the rumor, but the employee "indicated that nothing had happened between them when he was [a diversion officer]." *Id*. at 19-20. A tracking device was placed on the county pick-up truck issued to Mr. Savage, but defendant Junk "couldn't catch them together." *Id*. at 20. Defendant Junk's testimony in this regard is undisputed. Accordingly, the Court cannot say that defendant Junk's failure to fire a male employee based on rumors of a romantic relationship with an ex-offender evinces anti-female animus or was motivated by a discriminatory animus against women. *See Williams*, 187 F.3d at 565.

---

[7] The termination of plaintiff Daniels's employment is addressed *infra*.

Plaintiff Daniels testified about the gun incident, which she characterized as intimidating in light of the fact that she and defendant Junk did not have a good relationship at the time. *Daniels Deposition*, p. 32-36. However, she also testified that guns were kept in the Prosecutor's office, including in defendant Junk's office, on a regular basis; male employees also carried guns as part of their job. *Daniels Deposition*, p. 29. Moreover, plaintiff Daniels acknowledged that defendant Junk had joked and laughed in the past, although never with a gun. *Id*. at 31-32.[8]

Nothing in this record establishes that defendant Junk targeted plaintiff Daniels in this incident because of her sex. Instead, the record simply establishes that, as plaintiff Daniels concedes, she and defendant Junk did not enjoy a good working relationship at the time. Although defendant Junk and plaintiff Daniels may have disliked each other, harassment based on personal dislike generally does not equate with unlawful discriminatory harassment. *See, e.g., Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 343 (6th Cir. 1998)(noting that "personal conflict does not equate with discriminatory animus")(internal quotation marks omitted). Similarly, "the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender." *Wasek v. Arrow Energy Servs*., 682 F.3d 463, 467 (6th Cir. 2012). *See*

---

[8] Defendant Junk also testified about the gun incident: He and another employee were inspecting a firearm in a closed office when plaintiff Daniels entered the room. *Junk Deposition*, p. 40-41. In an apparent reference to the fact that he and plaintiff Daniels were not getting along at the time, he said, "'Hey, Pam, I'm not mad enough to use this on you.'" *Id*. at 41-42. He acknowledged that he "laughed about it . . . ." *Id*. at 42.

16

*also Trepka v. Bd. of Educ.*, No. 00-4063, 28 F. App'x 455, at *461 (6th Cir. Jan. 24, 2002) ("Our harassment jurisprudence requires that we distinguish between harassment and discriminatory harassment."). Plaintiff Daniels has not shown that the gun incident was motivated by her gender rather than by – at best – a poorly executed attempt at humor and – at worst – an inter-personal conflict. *Id.; Curry v. Nestle USA, Inc.*, No. 99-3877, 225 F.3d 658, at *4 (Table) (6th Cir. July 27, 2000) ("Taking the evidence in the light most favorable to plaintiff, we agree with the district court that plaintiff did not offer evidence sufficient to show that the harassment by Zab was based upon her sex, rather than personal animosity.").

This reasoning also applies to other isolated incidents about which plaintiffs complain. As noted *supra*, defendant Junk once referred to a song with an offensive title. *Daniels Deposition*, pp. 63-64. On another occasion, he was "furious" and "[s]tomped off" when plaintiff Daniels asked him for assistance in locating a case list. *Id*. at 43-44. However, plaintiffs have pointed to nothing that establishes that this conduct was directed at plaintiff Daniels because of her sex. Although his behavior may have been rude, the evidence suggests that his behavior was a function of either a personal conflict or of an unpleasant personality. These incidents do not, however, evidence unlawful discriminatory harassment. *See supra*.

Plaintiffs offer some evidence that could support gender-based harassment: Plaintiffs testified that defendant Junk accessed only the female employees' personal internet search histories even though male

17

employees also used their work computers for personal use. *Daniels Deposition*, pp. 18-21; *Barron Deposition*, pp. 26-29. When plaintiffs asked about the matter, defendant Junk allegedly became angry and screamed, "Don't think you can't be replaced." *Daniels Deposition*, pp. 18, 38-39; *Daniels Affidavit*, ¶ 10; *Barron Affidavit*, ¶ 10.[9]

Plaintiffs and Ms. Farmer also complain that defendant Junk did not permit plaintiff Barron to cash in her vacation time, but instead required her to calculate her vacation time and then use that time prior to her last day of employment. *Barron Affidavit*, ¶ 12; *Barron Deposition*, pp. 15-18; *Farmer Deposition*, pp. 59-60.[10] However, defendant Junk did permit men to cash in their accrued vacation time. *Junk Deposition,* pp. 10-12; *Farmer Deposition*, p. 60. Construing this evidence in a light most favorable to plaintiffs, the Court finds that this treatment appears to be based on plaintiffs' gender.

Moreover, some of defendant Junk's comments were explicitly gender-based: "That's why I don't like to hire women." "That's why it is a pain to hire women." "Working with men is so much easier than working with women." *Gullett Affidavit*, ¶ 20. Defendant Junk is also alleged to have stated that he "didn't need them [plaintiffs] as friends because he had plenty." *Roberts Affidavit*, ¶ 13. There is

---

[9] Defendant Junk denies that he checked only the female employees' computers. *Junk Deposition*, pp. 35-39. He specifically testified that he checked Mr. Reader's computer "a bunch" and pulled up Mr. Reader's computer history; that Mr. Reader did not access eBay after a meeting regarding internet use; that he could monitor Mr. Reader's computer screen without standing over Mr. Reader; that he did not access Jason Savage's computer on the particular morning in question because Mr. Savage was normally out on the road; and that he probably checked every employee's browser history at some point.

[10] Defendant Junk does not remember plaintiff Barron asking to cash in her vacation time when she submitted her resignation. *Junk Deposition*, p. 13.

also evidence that defendant Junk laughed and chatted with the male employees, *Farmer Deposition*, p. 22, but that the work area around the female employees was tense; there is also evidence that defendant Junk would "smirk" around the female employees, and once commented to plaintiff Daniels that "you look like you just lost your best friend." *Daniels Deposition*, p. 72; *Barron Deposition*, p. 43.

Mr. Gullett avers that defendant Junk and Mr. Reader asked him "to do things specifically to annoy or upset Angie Farmer," who was the only female working in the Prosecutor's office at the time. *Gullett Affidavit*, ¶ 22. This included asking Mr. Gullett "to be mean to Angie or do things to annoy her on purpose such as not tell her where I was going, or when/if I left the office for work duties." *Id*.

On another occasion, plaintiffs allege, defendant Junk popped packing materials in the area where the women worked, apparently in order to startle them. *Daniels Deposition*, pp. 59-61. On one or two occasions, defendant Junk said to members of the public who were in the front office, "[T]hese girls have work they need to be doing. I'm just making sure they're doing what they're supposed to do." *Daniels Deposition*, p. 63; *Barron Deposition*, pp. 33-34; *Junk Deposition*, pp. 50-51. Defendant Junk also observed, in front of the female employees, "Everybody working. Nobody whining. That's the way we like it." *Daniels Deposition*, pp. 61-62; *Barron Deposition*, p. 38. Defendant Junk also asked, in front of the female employees, if "everybody" had punched in on the time clock. *Daniels Deposition*, p. 62; *Barron Deposition*, p. 39; *Daniels Affidavit*, ¶ 8; *Barron*

*Affidavit*, ¶ 8; *Roberts Affidavit*, ¶ 6.  Moreover, defendant Junk often spoke to others about plaintiffs as if they were not present instead of addressing plaintiffs directly.  *Roberts Affidavit*, ¶ 14. On another occasion, after he had granted plaintiff Daniels additional time to buy clothing that complied with the new dress code, *see Daniels Deposition*, p. 24; *Roberts Affidavit*, ¶ 12; *Farmer Deposition*, pp. 25-26, defendant Junk said to her, "And didn't I say we were going to change the dress code around here?  Aren't you wearing jeans?" *Daniels Deposition*, pp. 25-26.  When plaintiff Daniels reminded him of the grace period that he had granted her, defendant Junk responded, "Well, if you say so" and "[s]tomped off."  *Id*.

The record does not include evidence of similar behavior on the part of defendant Junk towards the male employees.  Under these circumstances, plaintiffs have presented evidence of an unlawful, anti-female animus. *See Williams*, 187 F.3d at 565.

### 2. Totality of the circumstances:  Whether the harassment created a hostile work environment

The parties disagree whether defendant Junk's conduct, which the Court has found can be perceived as gender-based harassment, created a hostile work environment.  "'[T]he test for a hostile work environment has both objective and subjective components.'"  *Woods v. FacilitySource, LLC*, No. 15-3138, 2016 WL 403057, at *11 (6th Cir. Feb. 3, 2016) (quoting *Williams,* 187 F.3d at 566).

> "Conduct that is not severe or pervasive enough to create an *objectively* hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview.  Likewise, if the victim does not *subjectively* perceive the environment to be

20

> abusive, the conduct has not actually altered the
> conditions of the victim's employment, and there is no
> Title VII violation."

*Id.* (quoting *Harris*, 510 U.S. at 21-22) (emphasis added by Sixth Circuit). *See also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) ("[T]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must regard that environment as abusive.").

In determining whether, objectively, the alleged conduct is sufficiently severe or pervasive to constitute a hostile work environment, a court "must consider the totality of the circumstances[;]" the court must not focus on individual incidents of alleged harassment. *Id.* "'[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether – taken together – the reported incidents make out such a case.'" *Id.* (quoting *Williams*, 187 F.3d at 562 (emphasis in original). In determining whether the alleged harassment is severe or pervasive enough to create a hostile work environment, a court must consider various factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23) (internal quotation marks omitted). However, "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor*

*Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  *See also Oncale v.
Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) ("The
prohibition of harassment on the basis of sex . . . forbids only
behavior so objectively offensive as to alter the 'conditions' of the
victim's employment.").  Accordingly, "simple teasing, offhand
comments, and isolated incidents (unless extremely serious) will not
amount to discriminatory changes in the 'terms and conditions of
employment.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788
(1998) (internal citations omitted).  In short, "[t]hese standards for
judging hostility are sufficiently demanding to ensure that Title VII
does not become a 'general civility code' and that, applied properly,
will filter out complaints attacking 'the ordinary tribulations of the
workplace[.]'"  *Id.*  *See also Burlington N. & Santa Fe Ry. Co. v.
White*, 548 U.S. 53, 68 (2006) ("An employee's decision to report
discriminatory behavior cannot immunize that employee from those petty
slights or minor annoyances that often take place at work and that all
employees experience.").

In this case, plaintiffs aver that defendant Junk began treating
female employees less favorably than male employees in October 2013
and that this behavior continued beyond the time that plaintiff Barron
quit her job in December 2013 and until defendant Junk terminated
plaintiff Daniels's employment in January 2014.  *Daniels Affidavit*, ¶¶
5-19; *Barron Affidavit*, ¶¶ 5-13.[11]  The harassment during that period

---

[11] The Court disregards, at this point in the analysis, Mr. Gullett's sworn
statement regarding defendant Junk's treatment of Ms. Farmer, because that
statement, *see Gullett Affidavit*, ¶ 19, relates to a period of time after
plaintiffs' employment had ended. *See, e.g., Berryman,* 669 F.3d at 718;

of time, as alleged by plaintiffs, consisted of the following behavior
on the part of defendant Junk: (1) he permitted male diversion
officers (excluding Jason Savage) to work hours other than 8:30 a.m.
to 4:30 p.m.; (2) he did not strictly require male diversion officers
(excluding Jason Savage) to punch a time clock; (3) he accessed female
employees' computers to check on their personal internet search
histories and, on one occasion, he accessed and left female employees'
search histories on their computer screens; (4) he prohibited
plaintiff Barron from cashing in her vacation time, but permitted male
employees to do so; (5) he laughed and chatted with male employees,
but "smirked" at female employees; (6) on one occasion, he commented
to plaintiff Daniels that she looked like she had lost her best
friend; (7) he loudly popped packing materials in the area where the
female employees worked; (8) he told members of the public on one or
two occasions that "these girls have work they need to be doing. I'm
just making sure they're doing what they're supposed to do."; (9) he
stated in front of female employees, "Everybody working. Nobody's
whining. That's the way we like it."; (10) he asked, in front of the
female employees, whether "everyone" had punched the time clock; (11)
he spoke to others about plaintiffs as if plaintiffs were not present;
and (12) he asked plaintiff Daniels on one occasion why she was
wearing jeans and said "if you say so" and stomped off when plaintiff

---

*Wanchik v. Great Lakes Health Plan, Inc.*, No. 99-2333, 6 F. App'x 252, at
*262 (6th Cir. Mar. 2, 2001) ("[P]laintiff must have been aware of [the
alleged] incidents during her employment, even if indirectly, for the
accounts of others to be relevant."); *Jackson v. Quanex Corp.*, 191 F.3d 647,
661 (6th Cir. 1999).

Daniels reminded him that he had given her additional time to comply with the dress code. *See supra.*

Considering the totality of these circumstances and construing this evidence in a light most favorable to plaintiffs, the Court concludes that this alleged conduct does not rise to the level of harassing or discriminatory behavior constituting a hostile work environment. In making this finding, the Court has considered a number of factors. First, several of the incidents about which plaintiffs complain occurred on only one or two occasions. *See*, *e.g.*, *Faragher*, 524 U.S. at 788 (stating, *inter alia*, that isolated incidents, unless extremely serious, do not constitute a hostile work environment).

In addition, these incidents as well as the other, more frequently occurring, conduct, *i.e.*, accessing female employees' computers to check personal internet search histories, requiring female employees to clock in and to work between the hours of 8:30 a.m. to 4:30 p.m., "smirking" at female employees, commenting that no one is "whining" and "that's the way we like it," asking if "everyone" had clocked in, and talking about plaintiffs as if they were not there, were not severe. Plaintiffs have not alleged or demonstrated that any incident involved physical contact or even a threat of physical contact; even the gun incident about which plaintiff Daniels complains occurred in an office in which guns were regularly kept and did not involve a gun pointed at any person. *See also Daniels Deposition*, pp. 30-36, 70; *Barron Deposition*, pp. 45-46, 66-67. Instead, most of the incidents about which plaintiffs complain are

24

more properly characterized as simple teasing, offensive utterances, petty slights, or ordinary tribulations of the workplace. *See*, *e.g.*, *Faragher*, 524 U.S. at 788; *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. *Cf. Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481-82 (6th Cir. 2012) (rejecting claim for constructive discharge where supervisor "permit[ed] male employees to work through lunch and leave early on a regular basis, but [did] not permit[] [the female plaintiff] to do the same" and finding that "[a] reasonable person would not find that the new work hours [that required the same number of daytime hours and included a lunch hour] . . . were intolerable"). Notably, plaintiffs concede that defendant Junk had the right to make changes to office policies and plaintiffs' testimony reveals that defendant Junk's conduct apparently did not impair their ability to perform their jobs. *See*, *e.g.*, *Daniels Deposition*, pp. 16 (testifying that, when defendant Junk looked up the computer histories, "[w]e're like, 'Well, is there something that hasn't been done?' He couldn't answer."), 16-17 (admitting that office computers were there for office work), 18 (addressing the computer histories and stating that "[t]o my knowledge, neither one of us [plaintiffs] had missed anything."), 54 (admitting that it was the prosecutor's prerogative to set the working hours of the Prosecutor's office); *Barron Deposition*, pp. 26 (agreeing that office computers should be used for office work), 41 ("To my knowledge, we were good employees. We done our job, we made sure our stuff was done, and we done whatever that man [defendant Junk] asked us to do.").

25

Plaintiffs may have been subjectively upset by defendant Junk's conduct; however, a subjective perception of non-severe events cannot salvage a deficient hostile work environment claim. *See, e.g., Woods*, 2016 WL 403057, at *11 ("'[T]he test for a hostile work environment has both objective and subjective components.'") (citations omitted); *Bowman*, 220 F.3d at 463 ("[T]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must regard that environment as abusive."); *McCoy v. Mv Residential Prop. Mgmt., Inc.*, No. 2:14-CV-2642, 2016 WL 1392483, at *5 (S.D. Ohio Apr. 8, 2016) ("Although Plaintiff may have indeed been subjectively upset, her subjective perspective is insufficient to salvage her claims.").

Finally, although defendant Junk's behavior may be characterized as rude and even boorish, his behavior falls short of other, even more offensive, behavior that courts have rejected as a basis for a claim of hostile work environment. *Compare Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (upholding summary judgment in favor of defendant where a supervisor told several dirty jokes in the plaintiff's presence that were not aimed at her, made a verbal sexual advance related to the plaintiff's evaluation, referred to plaintiff as "Hot Lips," and made comments about her state of dress); *Stacy v. Shoney's*, Inc., No. 97-5393, 1998 WL 165139, at *1-3 (6th Cir. 1998) (finding no hostile work environment where, over a two-month period, the supervisor allegedly harassed the plaintiff with "sexually suggestive comments and leering looks" and "inappropriately

touched [the employee's] breast when he removed and replaced an ink pen from her front shirt pocket and said, 'That's a nice pen.'").

In short, the Court concludes that plaintiffs have not established this prong of their claim for a hostile work environment, *i.e.*, that her work environment was so objectively hostile as to alter the terms and conditions of her employment. Defendant Junk is therefore entitled to summary judgment on plaintiffs' hostile work environment claims.

## C.    Sex Discrimination – Constructive Discharge (Count I)

Plaintiffs also allege that defendant Junk discriminated against plaintiff Barron "by harassing her to the extent that she was forced to resign under duress, at which time Defendant Junk replaced her with a male employee." *Amended Complaint*, ¶ 33. Although plaintiffs do not explicitly use the term, the Court understands plaintiff Barron to assert a claim for constructive discharge. "To demonstrate constructive discharge, a plaintiff must adduce evidence that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (internal quotation marks and citations omitted). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)) (internal quotation marks omitted). The parties do not

disagree that plaintiff Barron quit her employment, a fact that satisfies the third prong of her constructive discharge claim. This Court must therefore consider whether plaintiff Barron has established the first two prongs of her claim.

In analyzing the first prong of a constructive discharge claim, a court must consider the following, singly or in combination:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a [male] supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Regan*, 679 F.3d at 482 (quoting *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005)). Of these considerations, plaintiffs rely on only defendant Junk's alleged harassment or humiliation allegedly designed to encourage plaintiff Barron's resignation; none of the other *Regan* considerations are present.

Defendant Junk's conduct may have upset plaintiff Barron, but his behavior did not create intolerable working conditions, as perceived by a reasonable person. Although plaintiff Barron may have cried because of defendant Junk's conduct at work, "hurt feelings are not enough to create a case of constructive discharge." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 479 (6th Cir. 2002).

Even construing in a light most favorable to plaintiffs the evidence of defendant Junk's intent to force plaintiff Barron to quit, *see Barron Deposition*, p. 55 ("He [defendant Junk] personally told me

at one point he was trying to get rid of Angie [Farmer], to make her
miserable enough to quit, which he done to me."), the record does not
establish that a reasonable person would have perceived the
Prosecutor's office as presenting intolerable working conditions.  As
discussed *supra*, several of the incidents were isolated.  *Cf. Mast v.
IMCO Recycling of Ohio, Inc.*, No. 01-3657, 58 F. App'x 116, at *124
(6th Cir. Feb. 3, 2003) (rejecting constructive discharge claim where,
*inter alia*, plaintiff alleged only isolated incidents and where
general allegations of being shunned by co-workers and supervisors
were not so unpleasant that a reasonable person would have felt
compelled to resign).  Although the more regularly occurring conduct
(*i.e.*, accessing female employees' computers to check histories,
requiring female employees to clock in and work between 8:30 a.m. to
4:30 p.m., "smirking" at female employees, asking if "everyone" had
clocked in, and talking about plaintiffs as if they were not there)
may have been upsetting, the Court is not persuaded that this conduct
rises to the level of intolerable working conditions sufficient to
establish a constructive discharge claim.  Notably, plaintiff Barron
also testified that defendant Junk accommodated her pregnancy by
permitting her to delay compliance with the dress code and permitted
her to take time off for doctors' appointments.  *Barron Deposition*,
pp. 22-23, 42.  Based on this record, the Court cannot say that these
working conditions were so intolerable that a reasonable person in
plaintiff Barron's position would have felt compelled to resign.  *See
Savage*, 665 F.3d at 739.  Having so concluded, plaintiff Barron's

claim for constructive discharge must fail.  *Id.; see also Regan*, 679
F.3d at 481-82.

### D. Sex Discrimination – Termination on the Basis of Gender (Counts I and IV)

Plaintiffs also allege that defendant Junk discriminated against
plaintiff Daniels by terminating her employment.  *Amended Complaint*,
¶¶ 31-37.  It  is unlawful for "an employer . . . to discharge any
individual, or otherwise to discriminate against any individual with
respect to compensation, terms, conditions, or privileges of
employment, because of such individual's . . . sex . . . ."  42 U.S.C.
§ 2000e-2(a)(1).  "When a claim of sex discrimination is built on
circumstantial evidence, . . . we use the three-step *McDonnell Douglas*
burden-shifting framework for evaluating the propriety of summary
judgment."  *Gunn v. Senior Servs. of N. Kentucky*, No. 15-5320, 632 F.
App'x 839, at *843 (6th Cir. 2015).  Under this framework, a plaintiff
must first prove a *prima facie* case of discrimination.  *Id.*  If she
does so, the burden then shifts to the defendant to proffer a
legitimate, non-discriminatory reason for the adverse employment
action.  *Id.*  If the defendant is able to do so, the burden then
shifts back to the plaintiff to show that the articulated reason is
mere pretext.  *Id.*  Here, plaintiffs have not offered direct evidence
of discrimination, so the Court will apply this burden-shifting
framework to its analysis.

To establish a *prima facie* case of gender discrimination, a
plaintiff must show that

> "(1) she is a member of a protected group; (2) she was
> subjected to an adverse employment decision; (3) she was
> qualified for the position; and (4) she was replaced by a
> person outside the protected class, or similarly situated
> non-protected employees were treated more favorably."

*Carroll v. Ohio Dep't of Admin. Servs.*, No. 13-3552, 555 F. App'x 512,
at *515 (6th Cir. Feb. 5, 2014) (quoting *Vincent v. Brewer Co.*, 514
F.3d 489, 494 (6th Cir. 2007)) (internal quotation marks omitted).  In
the case presently before the Court, neither plaintiffs nor defendant
acknowledge this burden-shifting framework or specifically address the
elements of plaintiff Daniels's *prima facie* case.  However, the Court
infers from the parties' filings that they do not disagree that
plaintiff Daniels was a member of a protected class, that she suffered
an adverse employment action, and that she was replaced by a person
outside the protected class, *i.e.,* Dave Dickerson. *See Junk
Deposition*, p. 21; *Farmer Deposition*, pp. 81-82.  Moreover, the Court
assumes, for these purposes, that plaintiff Daniels can establish the
remaining element of her *prima facie* case, *i.e.*, that she was
qualified for her job and performed it satisfactorily.

Again, the parties do not specifically address a purported
legitimate nondiscriminatory reason for the adverse action, but the
record includes Defendant Junk's explanation that he terminated
plaintiff Daniels' employment for "a number of things culminating in
her making a statement that I supposedly threatened her with a gun."
*Junk Deposition*, p. 40.  Defendant Junk testified that plaintiff
Daniels' complaint about the gun incident was

> basically whining and venting to other people.  If she
> thought I had done something wrong all she had to do was

> march over to the Sheriff's office, see Sheriff Rich
> Henderson, any of those guys.  They could have called the
> Bureau of Criminal Investigation.  They could have come
> down here, done a full investigation.

*Id.* at 63.  *See also Farmer Deposition*, pp. 43-45, 47-49 (testifying regarding defendant Junk's decision to fire plaintiff Daniels and plaintiff's discussion with Ms. Tackett and Ms. Hanna); *Roberts Affidavit*, ¶ 19 ("Mr. Junk told me that he was firing Ms. Daniels because she was 'disloyal.'").  Defendant Junk also articulated other factors culminating in the termination of plaintiff Daniels' employment:  according to defendant Junk, plaintiff Daniels was hostile to him after he implemented new office policies; she failed to follow directives; she lacked motivation; she had a bad attitude; she raised her voice at him; and she acted like she could do whatever she liked at work.  *Junk Deposition,* pp. 44-46, 49, 63-66.

Where, as here, the employer has presented evidence of a legitimate, non-discriminatory justification for the adverse employment action, the employee must then show that this articulated reason is mere pretext for actual, unlawful discrimination by showing that:  "(1) the employer's stated reasons for terminating the employee have no basis in fact, (2) the reasons offered for terminating the employee were not the actual reason for the termination, or (3) the reasons offered were insufficient to explain the employer's action." *Gunn v. Senior Servs. of N. Kentucky*, No. 15-5320, 632 F. App'x 839, at *844 (6th Cir. Dec. 7, 2015).  "[A] reason cannot be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell*

*Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (internal quotation
marks and citations omitted). In addition, under the "honest belief
rule" adopted by the United States Court of Appeals for the Sixth
Circuit, "[a]n employer has an honest belief in its reason for
discharging an employee where the employer reasonably relied on the
particularized facts that were before it at the time the decision was
made." *Carroll*, 555 F. App'x 512, at *515-16 (quoting *Majewski v.
Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001))
(citations and internal quotation marks omitted). "[R]egardless of
which rebuttal method a plaintiff uses, '[s]he always bears the burden
of producing sufficient evidence from which the jury could reasonably
reject the defendant's explanation and infer that the defendant
intentionally discriminated against h[er].'" *Gunn*, 632 F. App'x 839,
at *844 (quoting *Seeger*, 681 F.3d at 285)).

The parties do not expressly address the issue of pretext. More
specifically, plaintiffs have not shown that defendant Junk's
articulated reason for terminating the employment of plaintiff Daniels
is pretextual. Although plaintiff Daniels testified that she was a
good employee and that defendant Junk could not identify "something
that hasn't been done" by other employees, *Daniels Deposition*, p. 16,
plaintiffs have not shown that defendant Junk's reasons for firing her
were false and that discrimination was the real reason for terminating
her employment. *See Seeger*, 681 F.3d at 285. Notably, plaintiffs
have pointed to no evidence that undermines defendant Junk's testimony
that it was her telling other people that he had threatened her with a

33

gun that motivated his firing her.  *See Carroll*, 555 F. App'x 512, at
*515-16.  For all these reasons, plaintiffs' wrongful termination
claim fails and defendants are entitled to summary judgment on this
claim.

### E.    Retaliation (Counts II and V)

Plaintiffs allege that defendant Junk "fired Plaintiff Daniels in
retaliation for undertaking the protected activity of reporting
unlawful harassment." *Amended Complaint*, ¶ 41.  An employer may not
retaliate against an employee "because [s]he has opposed any practice
made an unlawful employment practice by this subchapter, or because
[s]he has made a charge, testified, assisted, or participated in any
manner in any investigation, proceeding, or hearing under this
subchapter." 42 U .S.C. § 2000e-3(a) (containing both "the opposition
clause" and "participation clause").  The Court must first consider
whether plaintiff Daniels has established a *prima facie* case of
retaliation.  She may do so by showing that

> (1) the plaintiff engaged in activity protected under Title
> VII; (2) plaintiff's exercise of her protected rights was
> known to defendant; (3) an adverse employment action was
> subsequently taken against the employee or the employee was
> subjected to severe or pervasive retaliatory harassment by
> a supervisor; and (4) there was a causal connection between
> the protected activity and the adverse employment action or
> harassment.

*Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013).

"[P]rotected activity includes complaints to co-workers,
reporters, and managers[.]" *Yazdian v. ConMed Endoscopic Techs.,
Inc.*, 793 F.3d 634, 647 (6th Cir. 2015).  *See also E.E.O.C. v. New
Breed Logistics*, 783 F.3d 1057, 1068 (6th Cir. 2015) "[I]t would be

34

unfair to read into [the opposition clause] a requirement that a complainant only engages in protected activity when s/he opposes the harassment to a 'particular official designated by the employer.'") (citations omitted).  "Title VII does not protect an employee, however, if his opposition is merely a 'vague charge of discrimination.'" *Yazdian*, 793 F.3d at 645 (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)). Similarly, a complaint about a management style or decision instead of discrimination against a protected class does not qualify as protected activity.  *See*, *e.g.*, *Booker*, 879 F.2d at 1313 (affirming grant of summary judgment on retaliation claim where the plaintiff "was not contesting any unlawful employment practice; he was contesting the correctness of a decision made by his employer . . . [and] generally attempts to dispute the employer's position with regard to his managerial style"); *Willoughby v. Allstate Ins. Co.*, No. 03-5501, 104 F. App'x 528, at *531 (6th Cir. 2004) ("The district court properly granted summary judgment [on the retaliation claim] because the [plaintiff's] letter was 'contesting the correctness of a decision made by his employer' rather than asserting discrimination.") (citing *Booker*, 879 F.2d at 1313).

Plaintiffs allege that defendant Junk terminated plaintiff Daniels' employment after she "reported Defendant Junk's discriminatory behavior to fellow county employees." *Amended Complaint*, ¶¶ 39-41.  As noted *supra*, when she was at the Pike County courthouse, plaintiff Daniels spoke to Dominique Hanna, a victim

35

advocate at the Partnership against Domestic Violence, and to Tara Tackett, a deputy at the Pike County Sheriff's department, about the Prosecutor's office. *Daniels Depositions*, pp. 36-37. Defendant Junk denies that plaintiff Daniels engaged in protected activity because she did not report his alleged conduct to the Pike County Sheriff or Commissioners and because plaintiff Daniels was simply venting frustration rather than reporting alleged unlawful harassment and discrimination. *Defendant's Motion*, pp. 10-12; *Defendant's Reply*, pp. 7-9.

Plaintiff Daniels did not report defendant Junk's alleged discriminatory conduct to the Pike County Sheriff or to the County Commissioners. She concedes that Ms. Tackett and Ms. Hanna were not her supervisors, that they had no formal connection to the Prosecutor's office, that Ms. Hanna had no authority over the Prosecutor or the Prosecutor's office, that Ms. Hanna was not the appropriate person to receive complaints regarding defendant Junk's alleged improper conduct, and that plaintiff Daniels did not report defendant Junk's conduct to the Pike County Commissioners. *Id*. at 36-37, 47-50. However, plaintiff Daniels testified that she believed that Ms. Tackett "had an obligation to report" the complaint to the Sheriff. *Id*. at 50.

Indeed, Ms. Tackett reported to Aaron Gullet, a supervisor in the Pike County Sheriff's office, *Gullett Affidavit*, ¶ 4, that "Rob Junk was brandishing a firearm in his office and either pointed a gun at her (Pam) in his office or in her general direction." *Id*. at ¶ 9. Mr.

36

Gullet, in turn, called his supervisor "because of the nature of this report and the fact that it involved the prosecutor. I made this report because I suspected that my supervisor would want to call the Ohio Bureau of Criminal Investigation to conduct an independent investigation." *Id.* at ¶ 10. Shortly thereafter, Mr. Reader, an employee of the Prosecutor's office, interviewed Ms. Tackett and obtained a written statement from Ms. Hanna. *Id.* at ¶¶ 11-13. Later, in the Prosecutor's office and in Mr. Gullett's presence, defendant Junk "picked up the phone and fired Pam Daniels over the phone just a few hours after she reported the incident with the gun to Tara Tackett." *Id.* at ¶ 18.

Under these circumstances, the Court rejects any contention that plaintiff Daniels did not report her complaint to an appropriate person.

However, the Court also concludes that plaintiff Daniels has not established that her complaint specifically alleged a discriminatory employment practice on the part of defendant Junk. Plaintiff's complaint, as recounted to Mr. Gullett, was about "Rob Junk . . . brandishing a firearm in his office and either point[ing] a gun at her (Pam) in his office or in her general direction." *Gullett Affidavit*, ¶ 9.[12] More significantly, plaintiff Daniels did not testify in her deposition that she specifically complained of unlawful harassment or discrimination:

---

[12] This is consistent with defendant Junk's testimony on deposition that it was plaintiff Daniels' statement "that I supposedly threatened her with a gun," combined with her "job performance, attitude, arguing with me all the time," that led him to fire her. *Junk Deposition*, pp. 40, 64.

Q:    Okay.  Now, as part of the complaint you indicate in January 15th, 2014, you went to the county court and was complaining about Rob's actions?

A:    Yes, I was telling two girls at county court about the behavior in the office - -

Q:    And who was that?

A:    -- environment.

Q:    Who were the girls?

A:    Dominique Hanna, and Tara Tackett.

*Daniels Deposition*, p. 36.

Q:    So you didn't—- but you didn't contact the sheriff about it?

A:    I didn't want to make an official report.  I knew Rob would fire us at the drop of a hat, but I thought maybe if she just said something, maybe somebody would say, "Rob, you need to settle it down.  This behavior is--" I mean, it was crazy.

Q:    But that's not really why you were talking to Tara, you were just upset and she happened to be someone you knew and you were telling her about it, right?

A:    I was asked why I was up there.  Rob had - - I had -- usually I was -- I wasn't at county court.  Rob had changed that and wanted me to start going to county court on court days for felonies as a victim advocate.

Q:    Okay.  Did you have a problem with that?

A:    No, no.  Nika had asked why I was there that day and I said, "Rob wanted me to come up - Rob wants me to start coming up on the felony - on preliminary hearings."

Q:    Okay.

A:    Rob had made a statement at - I don't know if it was a meeting for the Partnership against Domestic Violence or -- I don't remember why he was there, but he made a statement that I need to start going over -- something that she had heard, like he wanted me to start going over to their office too.  And I said -- I just went on about all the

38

changes and the treatment in the office. I went ahead and disclosed everything to Nika and Tara both at the table.

*Id*. at 50-51.

The *Daniels Deposition* identifies only vague complaints regarding "the behavior in the office . . . environment" and "all the changes and the treatment in the office[,]" which reflects merely her disagreement with defendant Junk's office policies and managerial style rather than a protected activity. *See Booker*, 879 F.2d at 1313. Although she testified that she "disclosed everything to Nika and Tara," *id*. at 51, plaintiff Daniels did not specifically state that she reported to Ms. Tackett or to Ms. Hanna – or to any other appropriate person – that she was being sexually harassed or discriminated against on account of her sex or gender.

It is true that, in her affidavit submitted in response to *Defendant's Motion*, plaintiff Daniels avers that she reported to Ms. Tackett and Ms. Hanna that she "was being sexually harassed and treated differently in the office." *Daniels Affidavit*, ¶ 17. However, a plaintiff may not overcome a motion for summary judgment "simply by contradicting . . . her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). "The rule therefore is that a party opposing summary judgment with an affidavit that contradicts her earlier deposition must explain why she disagrees with herself." *Powell-Pickett v. A.K. Steel Corp.*, No. 12-4424, 549 F. App'x 347, 352

(6th Cir. Dec. 2, 2013) (citing *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012)). *See also Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) ("A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction.") (citation omitted). Here, plaintiff Daniels does not justify, or even acknowledge, the inconsistency on this issue between her deposition and her affidavit. The Court therefore will not consider paragraph 17 of the later-filed *Daniels Affidavit*.

On this record, the Court is left only with evidence that plaintiff Daniels complained about defendant Junk brandishing a firearm in the office and her the vague complaints, as described in her deposition, regarding "the behavior in the office . . . environment" and "all the changes and the treatment in the office" and her testimony that she "disclosed everything to Nika and Tara[.]" There is simply no evidence that plaintiff Daniels specifically complained of gender-based, unlawful harassment or discrimination. Title VII does not protect these kinds of vague complaints of discrimination. *Yazdian*, 793 F.3d at 645. In short, plaintiffs have not established that plaintiff Daniels engaged in protected activity. As it relates to plaintiff Daniels' claim of retaliation, then, *Defendant's Motion* is meritorious.

**F. Intentional Infliction of Emotional Distress (Count III)**

Finally, plaintiffs assert a claim for intentional infliction of emotional distress, alleging that defendant Junk "berated and

40

belittled Plaintiffs constantly, treated them rudely and condescendingly, yelled at them for no reason, exhibited physically threatening behavior toward them, and in the case of Plaintiff Daniels, pointed a gun at her in a threatening manner." *Amended Complaint* ¶ 47.[13] In order to establish a claim for intentional infliction of emotional distress under Ohio law, a plaintiff must prove that

> (1) defendant[] either intended to cause emotional distress, or knew or should have known that [his] conduct would result in serious emotional distress to plaintiff; (2) defendant['s] conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community; (3) defendant['s] conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff suffered serious emotional distress, such that no reasonable person could be expected to endure it.

*Bragg v. Madison*, 20 F. App'x 278, 285-86 (6th Cir. 2001) (citing *Roe v. Franklin Cnty.*, 673 N.E.2d 172, 180 (Ohio Ct. App. 1996)). *See also Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) (citing *Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1132 (Ohio Ct. App. 1991)).

Plaintiffs testified that defendant Junk relished upsetting them and that his conduct, described *supra*, caused them distress. *See Daniels Deposition*, pp. 57-58, 60-61, 72; *Barron Deposition*, pp. 16, 46, 59-60, 64-65. Although plaintiffs offer their personal beliefs in this regard, they offer no evidence that defendant Junk intended to cause them emotional distress, knew that his conduct would cause them

---

[13] As noted supra, plaintiff Daniels expressly testified on deposition that, during the gun incident, the gun was not pointed at her. *Daniels Deposition*, p. 34.

emotional distress, or should have known his conduct would result in serious emotional distress. *See Bragg*, 20 F. App'x at 285-86. Moreover, plaintiffs offer no evidence even suggesting that defendant Junk's conduct "was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community." *Id.; see generally Amended Complaint; Plaintiffs' Response*. Notably, as discussed *supra*, plaintiffs concede that defendant Junk had the authority to implement and carry out some of the very things about which they complain, *e.g.*, the new hourly schedule, the time clock, the dress code, and checking personal internet histories on work computers.

Accordingly, as it relates to plaintiffs' claims of intentional infliction of emotional distress, *Defendant's Motion* is meritorious.


**WHEREUPON**, *Defendants'* [sic] *Motion for Summary Judgment*, ECF No. 25, is **GRANTED**.[14]

The Clerk is **DIRECTED** to enter **FINAL JUDGMENT**.



August 4, 2016                              *s/Norah McCann King*
                                         Norah McCann King
                                    United States Magistrate Judge


---

[14] Having concluded that plaintiffs' claims fail, the Court need not and does not address defendant Junk's qualified immunity argument or his claim to immunity pursuant to O.R.C. § 2744.03.